FILED

MAR 1 2 2012

~~[signature]~~
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DANIEL ANDERSON, | * | CIV 11-4009-RAL |
| | * | |
| Plaintiff, | * | |
| | * | OPINION AND ORDER |
| vs. | * | GRANTING PARTIAL |
| | * | SUMMARY JUDGMENT |
| WESTERN NATIONAL MUTUAL | * | |
| INSURANCE COMPANY, | * | |
| | * | |
| Defendant. | * | |

Plaintiff Daniel Anderson ("Anderson") filed a complaint against Defendant Western

National Mutual Insurance Company ("Western National") alleging breach of contract and bad

faith. Doc. 1. Western National filed a Motion to Bifurcate the breach of contract claim from the

first-party bad faith claim and later a Motion for Partial Summary Judgment on Anderson's bad

faith claim. Doc. 13, 20. For the reasons explained herein, Western National's Motion for Partial

Summary Judgment is granted, which renders the Motion to Bifurcate moot.

## I. FACTS

On September 4, 2007, Anderson was injured in an automobile accident at the intersection

of 41st Street and Six Mile Road in Sioux Falls, South Dakota. Doc. 25[1] at p. 1, ¶ 1; p. 3, ¶ 5.

Anderson was waiting to turn his GMC pickup left onto 41st Street, when a vehicle driven by

Kolbey Harshfield failed to stop at the Six Mile Road stop sign and slammed into the back of

---

[1] Under Local Rule 56.1, Defendant Western National Mutual Insurance Company filed a
Statement of Undisputed Material Facts. Doc. 21. Anderson appropriately responded by filing
Plaintiff's Response to Defendant's Statement of Undisputed Facts. Doc. 25. This Court takes
the facts in the light most favorable to Anderson, as the non-moving party, and draws the facts
primarily from the Plaintiff's Response to Defendant's Statement of Undisputed Facts. Doc. 25.
Because Anderson's pleading has two separate parts where paragraphs are numbered, this Court
cites to both the page number and the paragraph number of that pleading.

Anderson's pickup. Id. at p. 3, ¶¶ 6, 7. Harshfield was completely at fault for causing the accident. Id. at p. 1, ¶ 1. The collision caused Anderson's head to strike and shatter the rear windshield. Id. at p. 3, ¶ 9. An ambulance transported Anderson to the hospital where an emergency room physician diagnosed Anderson as having a sprain and/or strain of the neck and back with cervical spondylosis without myelopathy. Id. at p. 1, ¶ 3; p. 3, ¶ 12.

Because of head, back, and neck pain from the accident, Anderson underwent a series of 48 chiropractic treatments beginning on September 12, 2007. Id. at p. 1, ¶ 5; p. 3, ¶ 12; p. 4, ¶ 13. Anderson also attended physical therapy sessions for four to six weeks. Id. at p. 4, ¶ 14. After experiencing limited improvement in his symptoms, Anderson discontinued treatment in March of 2008, although he still suffers from the injuries from the motor vehicle accident.[2] Id. at p. 4, ¶¶ 13, 14; Doc. 26-1 at 12; Doc. 26-2 at 12-13. At the advice of his doctor, Anderson has continued physical therapy exercises on his own at home. Doc. 25 at p.4, ¶ 15. Anderson incurred more than $20,000 in medical bills in connection with the accident.[3] Id. at p. 4, ¶ 16. Anderson continues to struggle with left arm strength and mobility, shoulder soreness, daily headaches, and pain in his upper middle back and the right side of his neck. Id. Anderson works as a concrete contractor and reports that his injuries have affected his ability to do his job. Id. at p. 4, ¶ 17. Plaintiff's vocational expert Rick Ostrander estimates that Anderson's earning capacity has been decreased a minimum of $28,000 per year. Id. at p. 4-5, ¶ 20. Anderson's injuries also

---

[2] Anderson testified in November of 2010 that while visiting a physician, who treats Anderson for diabetes, Anderson reported having pain in his left shoulder, a stiff back, pain in his neck, and pain that radiates under his shoulder blades and produces a headache. Doc. 26-2 at 12.

[3] In the settlement demand letter, Anderson's attorney listed the past medical expenses as $20,721.63. Doc. 17-4 at 6.

2

restrict him from engaging in his favorite hobbies of hunting, fishing, and riding his motorcycle. Id. at p. 5, ¶¶ 21, 22, 23.

At the time of the accident, Anderson was insured under an automobile insurance policy issued by Western National affording, among other things, medical payments coverage with a limit of $2,000 and underinsured motorist benefits ("UIM") with a limit of $500,000.[4] Id. at p. 1, ¶ 2. After receiving an automobile loss notice in September of 2007, Western National informed Anderson of the various benefits that might be available to him under his auto policy, including the medical payments coverage and the UIM benefits. In October of 2007, Anderson's attorney sent a letter to Jackie Dekker, the claims adjuster at Western National handling Anderson's claim, notifying Dekker that Anderson would be seeking UIM benefits and that Western National's future communications with Anderson should be through Anderson's counsel. Id. at p.1, ¶ 4; p. 1, ¶ 7; p. 5, ¶ 25; Doc. 26-18.

Anderson in 2009 sued Harshfield in the United States District Court for the District of South Dakota. Doc. 25 at p. 1, ¶ 8. Western National contacted Anderson's attorney on January 4, 2010, to determine both the status of Anderson's claim and the amount of liability coverage available to Harshfield. Doc. 22 at 3. Anderson's counsel responded two days later, advising Western National that Anderson's treatment expenses were in the range of $30,000, that an expert was projecting a future loss of earning capacity totaling $500,000, and that Harshfield's liability

---

[4] "Underinsured motorist coverage allows the insured to collect the amount of that insured's own coverage less the amount of the tortfeasor's liability coverage" under South Dakota law. Kirchoff v. Am. Cas. Co. 997 F.2d 401, 402 n.2 (8th Cir. 1993) (quotation omitted); SDCL § 58-11-9.5.

coverage was $100,000.[5] Doc. 25 at p. 1, ¶ 7, 9. On January 12, 2010, Dekker requested that Anderson and his counsel furnish signed authorizations for release of medical information and a medical provider list. Id. at p. 1, ¶ 9. Dekker, based solely on what Anderson's counsel had told her, reserved $50,000 within Western National on Anderson's UIM claim. Id. On January 26, 2010, Anderson's attorney promised that medical records, bills, a medical provider list, and signed authorizations would be provided to Western National at the time Anderson formally presented his UIM claim to Western National. Id. at p. 1, ¶ 10.

On February 22, 2010, Western National received a Schmidt-Clothier[6] notice from Anderson's counsel advising that Anderson intended to settle his claims against Harshfield for $85,000, subject to Western National's consent. Id. at p. 1, ¶ 11; Doc. 22-1 at 5. Western National did not object to the settlement, and Anderson accepted the $85,000 on the Harshfield policy in early March of 2010. Doc. 25 at p. 1, ¶ 11.

Western National had conducted a partial investigation of Anderson's claim by gathering photographs of the accident, a copy of the police report, and certain coverage information. Id. at p. 5, ¶ 28; Doc. 26-8 at 28. Western National sent its file on Anderson's claim to Sioux Falls lawyer Douglas Deibert asking for Deibert's evaluation. Doc. 25 at p. 2, ¶ 13. In April of 2010,

---

[5] Western National had attempted to learn the extent of Harshfield's liability coverage earlier, but Grinnell Mutual Insurance Company, Harshfield's liability carrier, would not disclose this information to Western National. Doc. 25 at p. 1, ¶ 7.

[6] "The Schmidt/Clothier notice derives it[s] name from a Minnesota Supreme Court decision which first recognized a UIM carrier is entitled to notice of an expected settlement between its insured and a tortfeasor in order to protect its subrogation rights against the tortfeasor by substituting its payment for the tortfeasor's. See Schmidt v. Clothier, 338 N.W.2d 256, 263 (Minn. 1983). This method of preserving the UIM carrier's subrogation rights has been adopted by other jurisdictions, including South Dakota. See, e.g., Harter v. Plains Ins. Co., 579 N.W.2d 625, 631 n.3 (S.D. 1998)." Tripp v. W. Nat'l Mut. Ins. Co., 664 F.3d 1200, 1203 n.2 (8th Cir. 2011).

4

Anderson made a settlement demand to Western National for $400,000, the limit of the available UIM benefits under the policy and South Dakota law. Id. at p. 5, ¶ 26. Anderson's settlement demand package included copies of certain tax returns, treatment records, and the report of Plaintiff's vocational expert. Id. at p. 2, ¶ 14. The settlement demand package did not include signed medical authorizations, a separate medical provider list, a copy of Anderson's 2009 tax return, or any report that Anderson had sustained permanent injuries in the accident or had a permanent impairment rating due to injuries sustained in the accident. Id. The treatment records furnished to Western National included records of Anderson's treatment for neck, shoulder, or back pain dating back to 1995. Id. at p. 2, ¶ 15. Unbeknownst to Western National at that time, but as both counsel acknowledged in open court, Anderson's counsel, in lieu of sending authorizations for release of medical information and a provider list, had furnished all pertinent records from 1995 through the present regarding preexisting treatment and injuries from the motor vehicle accident. Upon receipt of the demand letter and the accompanying records, Dekker forwarded the materials to attorney Deibert. Id. at p. 2, ¶ 16.

On May 12, 2010, Dekker sent a letter to Anderson's attorney asking for a list of Anderson's medical providers for the past ten years and for executed medical authorizations to allow her to obtain Anderson's medical records directly from the medical providers. Id. at p. 2, ¶ 16; p. 6, ¶ 30. On that same day, Dekker corresponded with the South Dakota Division of Insurance in order to determine whether Western National was required to make a response to Anderson's settlement demand within 30 days. Id. at p. 2, ¶ 17. The South Dakota Division of Insurance informed Dekker that South Dakota law requires an insurer to act in a manner that is reasonable and consistent with a prompt investigation of a claim based upon the particular circumstances involved. Id.

5

On May 14, 2010, Deibert told Dekker that, based on his review of the Anderson file and his experience practicing insurance defense law in South Dakota, it was more likely than not that a verdict on Anderson's claim would not exceed the $100,000 threshold required to establish Anderson's entitlement to UIM benefits. Id. at p. 2, ¶ 18. Deibert's opinion was consistent with Dekker's view of the case. Id.

In June of 2010, Dekker received from Anderson's counsel the signed medical authorizations and a medical provider list. Id. at p. 2, ¶ 19; p. 6, ¶ 31. Anderson's attorney sent Anderson's 2009 tax return to Western National on October 20, 2010, which was as soon as the tax return became available. Id. at p. 2, ¶ 20; p. 6, ¶ 32. In his letter accompanying the 2009 tax return, Anderson's attorney noted that the tax return was the last document Western National desired to evaluate Anderson's claim and requested Western National to notify him if anything more was needed. Id. at p. 6, ¶ 32. Western National sought no further information from Anderson or his counsel. Id. at p. 6, ¶ 33.

Four weeks later, on November 15, 2010, Anderson's attorney phoned Dekker to inquire about the status of Dekker's review of Anderson's claim. Id. at p. 6, ¶ 34. Dekker said that she hoped to be back in touch the following week. Id. On November 19, 2010, about one month after she received it, Dekker forwarded the 2009 tax return to Deibert and asked Deibert to have a certified public accountant evaluate whether Anderson's pre-accident tax returns supported Anderson's earnings loss claim. Doc. 22-5 at 1. Deibert then consulted with a Sioux Falls CPA, John Wenande of Eide Bailly LLP. Dekker had no explanation of why she delayed nearly one month in sending the tax return to attorney Deibert.

On November 23, 2010, Anderson's attorney contacted Dekker by email, requesting an update on the status of Dekker's review of Anderson's claim. Id. at p. 6, ¶ 35. Dekker responded

that her review of the file would be done either that week or the first part of the following week. Id. On December 2, 2010, Dekker emailed Anderson's attorney and explained that she had yet to receive CPA Wenande's review of Anderson's tax returns. Id. at p. 7, ¶ 36; Doc. 26-15. Anderson's attorney responded by letter on the following day, requesting that Dekker contact him as soon as possible to let him know Western National's position on Anderson's UIM claim. Doc. 25 at p. 7, ¶ 36.

On December 13, 2010, Dekker, while waiting for a report from Deibert on the CPA's analysis, began preparing a summary of Anderson's claim in anticipation of a meeting of the Western National Claims Board ("Claims Board"). Id. at p. 2, ¶ 22; p. 11, ¶ 69. On December 14, 2010, Dekker again informed Anderson's counsel that Dekker had not completed her review of Anderson's claim and that she was still waiting for Wenande's review of Anderson's tax returns. Id. at p. 7, ¶ 37; Doc. 22-7.

On December 22, 2010, Dekker received a report from Deibert incorporating Wenande's review of Anderson's tax returns. Id. at p. 2, ¶ 23. Deibert's report advised that Anderson's pre-accident earnings made Wenande question the validity of Anderson's loss of earnings claim. Id. Deibert also indicated that any actual loss of earnings could be explained, at least in part, by a downturn in the construction business. Id. Deibert expressed no change in his previous opinion that Anderson's claim likely did not have a value in excess of the underlying tortfeasor's insurance limit of $100,000.

Dekker met with the Claims Board on January 10, 2011. Id. at p. 2, ¶ 22. The Claims Board only convened on alternating Mondays and, because of Dekker's December 22, 2010 receipt of Deibert's report and the intervening holidays, January 10, 2011, was the first available time to discuss Anderson's claims. Id.; Doc. 22 at 7. At the meeting, the Claims Board reviewed

7

Dekker's summary[7] of Anderson's claim, photos of Anderson's vehicle, and the police report
concerning the accident.[8] Doc. 25 at p. 11, ¶ 69; Doc. 26-8 at 19. Anderson's actual medical
records were not part of the information reviewed by the Claims Board. Doc. 25 at p. 11, ¶ 69.
The consensus at the Claims Board meeting was that Anderson's claim did not exceed the
$100,000 threshold for entitlement to UIM benefits. Id. at p. 2, ¶ 24. The Claims Board
nevertheless determined that an offer should be made to Anderson in the amount of the anticipated
costs of defending Anderson's claim. Id. The Claims Board instructed Dekker to confer with

---

[7] The "Claimant Information" section of Dekker's summary of Anderson's claim reads:
Dan Anderson: Was taken to hospital by ambulance treated & released.
Diagnosis: Neck sprain/strain, sprain/strain of unspecified site of back. Cervical
spondylosis without myelopathy Started treating with chiro, Amanda Van Voorst
on 9/12/07, diagnosis: Cervical, thoracic, sacroiliac & lumbar sprain/strain &
myofacitis/myofibrositis. Was advised to return for treatment 3 x @ week until
symptoms improve. Insd received 48 treatments in less than 6 months.

On 11/30/07 Insd presented to Orthopedic Institute and an MRI was done of the
cervical spine and lt shoulder. Cervical Spine: No Fx or subluxation, mild right
uncovertebvral facet arthrosis & shallow right disk protrusion without cord
compression, central canal stenosis or neural foraminal stenosis, mild endplate
spondylosis & circumferential disk bulging at c5-6 without associated cord
compression, central canal stenosis or neural formanial stenosis. Left Shoulder:
Supraspinatus tendinosis with low grade partial thickness articular surface tear of
distal anterior fibers of the supraspinatus tendon (rim rent tear) Subacomial
subdeltoid bursitis.

On 12/3/07 Insd followed up with Ortho Surgeon & was prescribed a therapy
program. Started PT and continue through 2/15/08. Nothing more scheduled
after that and was discharged on 6/6/08.

Last chiro record of treatment is 2/29/08.

Doc. 26-17. Dekker, when asked to do so during her deposition, struggled to explain some of the
medical terminology she used in her summary of Anderson's claim. Doc. 25 at p. 12, ¶ 71.

[8] Dekker testified that she didn't recall whether any of Deibert's letters were presented to
the Claims Board. Doc. 26-8 at p. 19.

Deibert concerning a formal response to Anderson's policy limits settlement demand. Id. at p. 2, ¶ 25. Dekker intended to initially offer Anderson $10,000 to settle his claim and to work up to a maximum offer of $25,000 if necessary to settle the claim. Id. at p. 13, ¶ 74.

Anderson and his attorney were unaware of the Claims Board meeting. On January 12, 2011, two days after the Claims Board met, Anderson filed this lawsuit against Western National. At the time Anderson filed suit, Western National had yet to deny Anderson's UIM claim or to make any offer to settle it. Id. at p. 7, ¶ 38. At the time the Complaint was filed, Western National had been in possession of the settlement demand package for nearly nine months and had received the final requested materials nearly three months previously.

Anderson's opposition to the motion for partial summary judgment draws heavily from deposition testimony of Dekker. When deposed in this case, Dekker testified that although Western National has the obligation under South Dakota's Unfair Trade Practices act to adopt and adhere to reasonable standards for the prompt investigation of its claims, Western National has adopted no formal written policies designed to satisfy this obligation. Doc. 25 p. 7, ¶ 39. Joleen Craemer ("Craemer"), a field manager and seventeen year employee of Western National, echoed this testimony. Id. at p. 7, ¶ 40. Rather than a written training manual or claims manual to assist its adjusters in handling claims, Western National trains new claims adjusters by having them shadow another adjuster and ostensibly assures uniformity in claims handling practices through yearly audits of the claims files. Id. at p. 8, ¶ 41. Dekker testified that she did not receive any formal training at Western National regarding written policies and procedures, nor did she receive a training manual or a claims manual as a Western National adjuster. Id. at p. 8, ¶ 42.

Dekker testified that when evaluating a bodily injury claim, she considers the "the type of injury, the type of treatment, obviously the diagnosis, [and] the amount of medical [bills] incurred."

9

Id. at p. 8, ¶ 43. Dekker stated that she does not know how other adjusters at Western National evaluate their claims, although she thinks they generally look at the same factors that she does. Id. Dekker further testified that she also considers pain and suffering that the insured experienced as a result of the accident. Id. at p. 8, ¶ 44. When asked how she puts a monetary value on pain and suffering, Dekker said that there is no set formula or process but that she tries to put herself in the position of the insured and fairly evaluate what their pain and suffering warrants in the way of compensation. Id. at p. 8, ¶ 45. Dekker said she considers the medical treatment that the insured has gone through and whether the insured has exhausted all treatment options and whether they have a disability rating. Id. at p. 8, ¶ 46. Dekker also testified that loss of enjoyment of life was an additional element that she considers when evaluating a claim, although she struggled when asked to explain how the loss of enjoyment of life suffered by an insured is converted into a monetary figure. Id. at p. 9, ¶ 47.

Dekker testified that, based upon her review of the records, she did not believe Anderson had a permanent injury as a result of the accident. Id. at p. 9, ¶ 53. Dekker said that if Anderson had suffered a permanent injury, it may have changed the way she valued Anderson's claim; she would have factored Anderson's future pain and suffering into the compensation amount he was entitled to receive. Id. Dekker had not requested Anderson to undergo an independent medical evaluation. Id. at p. 9, ¶ 50. Dekker testified that she believed Anderson was exaggerating the extent of his injuries. Id. at p. 11, ¶ 67.

During her deposition, Dekker acknowledged that the accident caused Anderson's shoulder injury, but testified that she thought the injury had been fully resolved because Anderson had been discharged from physical therapy. Id. at p. 9, ¶ 54. However, Anderson's deposition from the underlying liability case, which Western National did not obtain, indicated that Anderson's back,

10

neck, and shoulder injuries were not resolved and that he had stopped formal treatment because it was no longer improving his symptoms. Id. at p. 10, ¶ 55.

Dekker testified that she assumed, based upon an entry made on Western National's computer system by the medical payments adjuster, that Anderson had been in a second accident on September 7, 2007, only three days after the first accident. Id. at pg. 13, ¶ 77. Anderson was supposedly the at-fault driver in the alleged second accident. Id. Dekker said that her belief that Anderson had been involved in a second accident, in which he was at fault and claiming to have suffered no injuries, made her skeptical of his claim in this matter that all of his injuries stemmed from the accident for which he was not at fault. Id. at p. 14, ¶ 78. It later became clear that it was a member of Anderson's family, rather than Anderson himself, who was involved in the second accident. Id. at p. 14, ¶ 79. There is no indication that attorney Deibert or the Claims Board was confused about there being a second accident.

## II. DISCUSSION

### A. Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is not "a disfavored procedural shortcut, but rather . . . an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Rule 1 of the Federal Rules of Civil Procedure). On summary judgment, courts view "the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." E.E.O.C. v. CRST Van Expedited, Inc., 2012 WL 555510, at *20 (8th Cir. Feb. 22, 2012). A party opposing a properly made and

supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is generally disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012).

**B. Bad Faith Claim**

**1. Propriety of Summary Judgment on Bad Faith Claim**

The Supreme Court of South Dakota first recognized a cause of action for insurance bad faith in Champion v. United States Fid. & Guar. Co., 399 N.W.2d 320 (S.D. 1987). The published version of the Champion case unfortunately omitted a phrase and employed a comma splice in a key passage[9] creating a confusing standard. The Supreme Court of South Dakota subsequently has re-stated the standard as follows:

> [T]here must be an absence of a reasonable basis for denial of policy benefits [or failure to comply with a duty under the insurance contract] and the knowledge or reckless disregard [of the lack] of a reasonable basis for denial[.] [I]mplicit in that test is . . . that the knowledge of the lack of a reasonable basis may be inferred and imputed to an insurance company where there is a reckless disregard of a lack of reasonable basis for denial or a reckless indifference to facts or to proofs submitted by the insured.
>
> Under these tests of the tort of bad faith, an insurance company, however, may challenge claims which are fairly debatable and will be found liable only where it has intentionally denied (or failed to process or pay) a claim without a reasonable basis.

---

[9] The key passage in Champion read as follows:

We have stated above that, for proof of bad faith, there must be an absence of a reasonable basis for denial of policy benefits *and* the knowledge or reckless disregard of a reasonable basis for denial, implicit in that test is our conclusion that the knowledge of the lack of a reasonable basis may be inferred and imputed to an insurance company where there is a reckless disregard of a lack of a reasonable basis for denial or a reckless indifference to facts or to proofs submitted by the insured.

399 N.W.2d at 324.

Dakota, Minn. & E. R.R. Corp. v. Acuity, 771 N.W.2d 623, 629 (S.D. 2009) (quoting Walz v. Fireman's Fund Ins. Co., 556 N.W.2d 68, 70 (S.D. 1996)) (some brackets in original and some brackets added to aid understanding).

Since the Champion decision, the Supreme Court of South Dakota has expanded where a bad faith claim may be maintained to include more than mere denials of claims. In Dakota, Minn. & E. R.R. Corp., the Supreme Court of South Dakota stated "first-party bad faith is an intentional tort and typically occurs when an insurance company consciously engages in wrongdoing during its *processing* or *paying* of policy benefits to its insured." 771 N.W.2d at 629 (citation omitted). That is, "bad faith can extend to situations beyond mere denial of policy benefits." Id. (citation omitted). "Bad faith conduct may include the failure to conduct a reasonable investigation concerning the claim." Id. A bad faith claim in South Dakota may be based on a "failure to comply with a duty under the insurance contract," but still must involve "an insurance company consciously [engaging] in wrongdoing." Dakota, Minn. & E. R.R. Corp, 771 N.W.2d at 629; see also Hein v. Acuity, 731 N.W.2d 231, 236 (S.D. 2007) ("[B]ad faith can extend to situations beyond mere denial of policy benefits."). The precise contours of a bad faith claim against an insurer in South Dakota remain less than completely clear at the present time.

Whether an insurer acted in bad faith is "determined based upon the facts and law available to the insurer at the time it made the decision to deny coverage." Dakota, Minn. & E. R.R. Corp, 771 N.W.2d at 629 (quotations omitted). "The question of whether an insurer has acted in bad faith is generally a question of fact." Id. at 629-30 (quotations omitted); see also Walz, 556 N.W.2d at 70.

An insurer does not engage in actionable bad faith if the plaintiff's claim was "fairly

debatable." Id. In considering whether a claim was fairly debatable, courts may look to the adequacy of the insurer's investigation and consideration of the claim. If an insurer conducted an inadequate investigation of a claim, and, by doing so, failed to locate information indicating that the plaintiff was entitled to benefits, then the claim may not be fairly debatable, and the insurer may be responsible under a bad faith claim. The same would be true if the insurer's reasons for questioning the validity of the plaintiff's claim, or arguing that the claim was fairly debatable, stemmed from the insurer's failure to investigate the claim. This view of the tort of bad faith is consistent with the idea that a failure to investigate, without more, does not constitute bad faith. See 14 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 207:25 (3d ed. 2011) ("An imperfect investigation, standing alone, is not sufficient cause for recovery where the insurer, in fact, has objectively reasonable basis to deny coverage."); Stephen S. Ashley, Bad Faith Actions Liability & Damages § 5:8 (Updated September 2011) ("When it is alleged that an insurer failed to obtain some information that its duty to investigate required it to consider, one must ask how things would have turned out differently if the insurer had had the omitted information. If a reasonable insurer would still have denied the claim, despite knowledge of the omitted information, then the insurer's breach of its duty to investigate caused the insured no harm, for even if it had completely fulfilled its duty to investigate, the insured would not have obtained his insurance benefits without a lawsuit. An inadequate investigation does not entitle the insured to a verdict in his favor unless the insurer's lapse causes harm to the insured."); see also Arp v. AON/Combined Ins. Co., 300 F.3d 913, 916 (8th Cir. 2002) (applying South Dakota law and stating "being dilatory or even slow doesn't in and of itself amount to bad faith").

Considering the facts in the light most favorable to Anderson and the evidence known to Western National during the pertinent time, this Court concludes that Anderson's claim to

14

compensation exceeding $100,000 was and is fairly debatable. Anderson was not responsible for the motor vehicle accident and was injured. His head struck and shattered the back window of his pickup cab. He was taken by ambulance to a hospital, treated for neck and back strain, and released that day. He underwent extensive chiropractic care and then physical therapy for neck, back, and shoulder issues and headaches. He has not undergone medical treatment for any injury related to the injuries from the motor vehicle accident since March of 2008,[10] although he does some physical therapy exercises in his home. His total medical bills related to the motor vehicle accident were $20,721.63. He reports ongoing pain and limitations from his injuries. No physician has assigned a permanent impairment rating to Anderson nor concluded that his injuries are permanent, although they may be. Anderson had a prior history of treatments for neck and back issues. Anderson has a vocational expert who opines that Anderson's income has declined a minimum of $28,000 per year. A Sioux Falls CPA evaluated Anderson's tax returns and questioned the validity of the loss of earnings claim. Western National hired Deibert, an experienced and capable outside-counsel from South Dakota,[11] to evaluate Anderson's claim.

---

[10]As mentioned previously, Anderson testified that he did mention the neck and shoulder pain in November of 2010 when he met with the doctor who treats Anderson for his diabetes.

[11]  Anderson raises no questions about the experience, independence, or competence of either attorney Deibert or CPA Wenande. Nor is there a basis to do so. Under Rule 201 of the Federal Rules of Evidence, this Court takes judicial notice information readily known and available in the Southern Division of South Dakota about Deibert and Wenande. Attorney Deibert was admitted to the State Bar of South Dakota in 1973. Deibert's primary practice areas include insurance defense and coverage. Deibert has a lengthy list of reported cases, and has been named in Best Lawyers in America. See Cadwell Sanford Deibert & Garry LLP, http://www.cadlaw.com/douglass.html (last visited Mar. 2, 2012). CPA Wenande has more than 38 years of public accounting and consulting experience. Wenande offers a number of consulting services, including business valuation and litigation support for economic damage cases. Wenande has testified in state and federal court more than 75 times for litigation support purposes. See Eide Bailey, http:www.eidebaily.com/contact-us/find-a-professional-profile?professionalID=2610 (last visited Mar. 2, 2012).

15

Diebert advised Western National that, based on his experience and review of the file, the claim was likely not worth more than the $100,000 threshold of the UIM coverage.

Anderson's claim, based on these facts not subject to genuine dispute, might be worth more than the $100,000 threshold of UIM coverage, or it might not. In short, the question of whether the value of the claim exceeds $100,000 is fairly debatable.

The facts in this case are materially different from those in Tripp v. W. Nat'l Mut. Ins., No. 09-4023, 2010 WL 547181 (D.S.D. Feb. 9, 2010), where the Court denied Western National's motion for partial summary judgment on a bad faith claim arising out of a UIM claim. Id. at *4-5. In Tripp, Western National had questioned a loss of earnings claim, but "had little to no information that disputed" the claim and had "failed to investigate the pending [UIM] claim for almost two years prior to rejecting the settlement demand." Id. at *4. By contrast, in this case, Western National had investigated the claim, retained outside counsel to render an independent opinion on whether the value of the claim exceeded the $100,000 UIM threshold, and had outside counsel consult with a CPA regarding the loss of earnings claim. See T.G.S. Transp., Inc. v. Canal Ins. Co., 216 Fed. App'x 708, 709 (9th Cir. 2007) (insurer not liable for bad faith denial of insurance claim in part because insurer relied on advice of counsel in denying claim); Larsen v. Allstate Ins. Co., 857 P.2d 263, 266 (Utah Ct. App. 1993) (insurer's position was "fairly debatable" in part because insurer relied on opinion of attorney).

**2. Anderson's Arguments Against Summary Judgment**

Anderson asserts that there are genuine issues of material fact concerning his bad faith claim because Western National allegedly: 1) failed to investigate his claim; 2) "low-balled" Anderson by deciding to offer him $10,000 to settle; and 3) violated South Dakota's Unfair Trade Practices Act. This Court considers each of these arguments in turn.

## a. Failure to Investigate

Anderson argues that Western National committed bad faith by failing to conduct a proper investigation of his claim. In support of this argument, Anderson relies on Dakota, Minn. & E. R.R. Corp., in which the Supreme Court of South Dakota explained that an insurer's investigation and consideration of a claim is relevant when determining whether a claim is fairly debatable. 771 N.W.2d at 630; see also Hammonds v. Hartford Fire Ins. Co., 501 F.3d 991, 996 (8th Cir. 2007) (applying South Dakota law and stating that "[i]ntegral to the inquiry of whether there was (1) an absence of a reasonable basis for denial and (2) knowledge or a reckless disregard of the lack of a basis for denial is whether a claim was properly investigated and whether the results of the investigation were subjected to a reasonable evaluation and review.") (quotations omitted). The Supreme Court of South Dakota in Dakota, Minn. & E. R.R. Corp., reversed a grant of summary judgment on the plaintiff's bad faith claim because

> [T]he facts suggest that the [uninsured motorist] claim was denied because [the insurer] concluded there were no independent witnesses to support [the employee's] claim that the unidentified driver caused the accident. Based upon this apparent erroneous conclusion, [the insurer] did not conduct any further investigation into the accident. [The insurer] has provided no explanation for how or why it reached this conclusion. Further, [the insurer] has not shown that it made attempts to interview the insured, interview the eye-witnesses to the accident it knew existed, or investigate any of the actual facts of the accident.

Id. at 631.

Here, Western National did not contest that an accident occurred, that Anderson was injured in the accident, and that Anderson was blameless for the accident. Western National did an investigation. Western National did not interview Anderson, but Anderson was represented by counsel who requested that Western National direct all communications to Anderson through

17

Anderson's counsel. As this Court has explained, whether the value of Anderson's claim exceeds $100,000 is fairly debatable under the undisputed material facts. Western National's investigation and handling of this case makes the case distinct from Dakota, Minn. & E. R.R. Corp. Cf., See Merriam v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 572 F.3d 579, 586 (8th Cir. 2009) (applying Iowa law and explaining that "an improper investigation cannot alone sustain a tort action for bad faith if the insurer had an objectively reasonable basis for denying the insured's claim."); Reid v. Pekin Ins. Co., 436 F. Supp. 2d 1002, 1012-13 (N.D. Iowa 2006) (plaintiff's contention that insurer's experts conducted imperfect investigation did not preclude a grant of summary judgment on plaintiff's bad faith claim where opinions from other experts made claim fairly debatable); LeRette v. Am. Med. Sec., Inc., 705 N.W.2d 41, 49-50 (Neb. 2005) (insured's bad faith claim failed as a matter of law because insurer had an arguable basis on which to deny insured's claim); State Farm Mut. Auto Ins. Co. v. Smith, 956 So.2d 1164, 1167 (Ala. Civ. App. 2006) (insurer did not commit bad faith by failing to investigate insured's UIM claim where insurer carefully considered insured's medical records and "had a legitimate reason to dispute the extent of [the insured's damages resulting from the accident].").

It is true that Western National's claims representative Dekker harbored a mistaken belief that Anderson was involved in a second automobile accident close in time to the accident in question, making Dekker skeptical of Anderson's claim that all of his injuries stemmed from the accident at issue. In fact, it was a family member of Anderson who was in that second accident. However, there is no evidence that Dekker's mistake caused her to mislead Deibert or the Claims Board.

**b. "Low-ball" Offer**

Anderson contends that Dekker's decision to offer him $10,000 to settle his claim is

evidence of bad faith. Actually, Western National had not made any offer prior to Anderson filing

the suit. Regardless, viewing the facts in the light most favorable to Anderson, this is a case where

a denial of benefits could be inferred because of the lack of any offer despite the lapse of nearly

nine months from the initial demand and nearly three months from when Anderson supplied the

last piece of information sought by Western National. See Kirchoff v. Am. Cas. Co., 997 F.2d

401, 405 (8th Cir. 1993) (applying South Dakota law and explaining that a "[d]enial of benefits

may be inferred from the insurer's failure to process or pay a claim . . .").

Here, whether the value of the claim exceeded the $100,000 threshold for UIM coverage

was fairly debatable. Thus, the fact that Western National failed to be more timely in making any

offer and then chose to make an offer of $10,000 does not give rise to a viable bad faith claim,

even though Dekker previously had reserved $50,000 for Anderson's claim. In her affidavit,

Dekker explained that the $50,000 was an "arbitrary amount since I had no way of evaluating the

UIM claim at that time." Doc. 22 at 4. Both attorney Deibert and the Claims Board evaluated

Anderson's claim independently as not likely to exceed $100,000. Whether that conclusion is right

or not is fairly debatable.

**c. Violation of South Dakota's Unfair Trade Practices Act**

Anderson's final argument concerning Western National's alleged bad faith relates to

South Dakota's Unfair Trade Practices Act. Anderson contends that Western National violated

SDCL 58-33-67 by failing to adopt reasonable standards for the prompt investigation of claims.

SDCL 58-33-67 states in relevant part:

> In dealing with the insured or representative of the insured, unfair
> or deceptive acts or practices in the business of insurance include,
> but are not limited to, the following:
> (1) Failing to acknowledge and act within thirty days upon
> communications with respect to claims arising under insurance

19

> policies and to adopt and adhere to reasonable standards for the
> prompt investigation of such claims.

SDCL 58-33-67 does not create a private right of action. Indeed, SDCL 58-33-69 provides that "[n]othing in §§ 58-33-66 to 58-33-69 inclusive, grants a private right of action."

Anderson argues, however, that Western National's alleged violation of SDCL 58-33-67 is evidence of bad faith. Anderson has not directed this Court to any cases from the state of South Dakota or the Eighth Circuit holding that a violation of SDCL 58-33-67 is evidence of bad faith, although the Dakota, Minn. & E. R.R. case does consider the absence of investigation as possible evidence of bad faith. The tort of bad faith in South Dakota focuses on whether or not the insurer had a reasonable basis for denying benefits under the policy and whether the insurer knew or recklessly disregarded the lack of a reasonable basis in denying the claim. A violation of SDCL 58-33-67(1)—a provision that is focused on the adoption of reasonable standards to provide for the *timely* investigation of claims—does not prove either prong of the South Dakota bad faith test. See Arp, 300 F.3d at 916 (applying South Dakota law and stating that "being dilatory or even slow doesn't in and of itself amount to bad faith."). This conclusion holds true even if South Dakota law allows a plaintiff, regardless of whether the insurer has a reasonable basis to deny the plaintiff's claim, to recover from an insurer on a bad faith "failure to investigate" claim. Section 58-33-67 is aimed at the timeliness, rather than the quality, of an insurer's investigation. Western National's alleged violation of SDCL 58-33-67(1) is not a material fact that prevents the court from granting summary judgment on Anderson's bad faith claim when the question of Anderson's entitlement to more than the $100,000 UIM limit is fairly debatable as a matter of law.

## III. CONCLUSION

For the reasons explained in this Opinion and Order, it is hereby

ORDERED that Defendant's Motion for Partial Summary Judgment (Doc. 20) is granted

and that counsel cooperate with the Court in setting a jury trial on the remaining UIM claim.  It is

further

ORDERED that Defendant's Motion to Bifurcate (Doc. 13) is denied as moot.

Dated March 12th, 2012.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE